Michael J. MACY

v.

**TRANS WORLD AIRLINES, INC.,**
**a body corporate.**

**Civ. A. No. 73–1080–M.**

United States District Court,
D. Maryland.

Sept. 3, 1974.

**144**

Harvey J. Siegel, Baltimore, Md., for plaintiff.

H. Thomas Howell, Joseph A. Schwartz, III, and Semmes, Bowen & Semmes, Baltimore, Md., for defendant.

JAMES R. MILLER, Jr., District Judge.

This is a suit in which the plaintiff, Michael J. Macy, seeks damages from Trans World Airlines, Inc. (TWA) for alleged libelous and defamatory statements made concerning him by an employee and agent of the defendant. Jurisdiction is based upon diversity of citizenship. Defendant has filed a motion for summary judgment.

The cast of characters consists of the plaintiff who, apparently, worked on a ramp at the Friendship International Airport in Baltimore, Maryland, as an employee of the defendant, TWA; W. H. Buxton, who was a supervisor of ramp services for TWA; Jack Burton and one Mr. Martinek, who were co-employees of Macy; Mr. Barton, who was a union shop steward, as was Mr. Thomas L. Yoder; and Mr. C. J. Cox, manager of customer services for the defendant.

The pleadings, affidavits, and depositions now on file establish the following facts in the record without contradiction:

At the air freight facility of TWA at the Friendship Airport an hydraulic fitting on a Dortech loader was found to have been damaged in early October, 1972. Mr. Cox directed Mr. Burton and Mr. Martinek to make an investigation of the damage. Mr. Burton and Mr. Martinek reported on either October 4 or October 5, 1972, to Mr. Cox that they had made an investigation, that they believed the fitting had been sabotaged deliberately and that Mr. Macy, the plaintiff herein, was the only person in the vicinity of the fitting at or near the time when the damage had to have occurred.

Mr. Cox, according to his deposition, upon receipt of said investigative report, contacted his superiors in Philadelphia and a decision was reached to suspend Macy pursuant to the provisions of the collective bargaining agreement between the defendant and the International Association of Machinists and Aerospace Workers, said agreement being filed as Exhibit A to the defendant's motion for summary judgment.

According to the deposition of Mr. Cox, the practice was to suspend an employee orally at or shortly before the end of that employee's shift and for the suspension to be made by the employee's supervisor. The shift of Macy ended at 2:30 p. m., on October 5, 1972. On that day, Mr. Buxton, acting at the direction of Mr. Cox, subsequent to 2 p.m., told plaintiff in the presence of Mr. Barton that he was suspended in approximately the following words: "You are suspend-

ed for sabotaging ground equipment. A letter will be mailed to you stating the hearing date and the charges."

Thereafter, Buxton sent a letter to plaintiff dated October 6, 1972, which stated in part as follows:

"The charge against you is ground equipment sabotage; specifically, damage to a hydraulic fitting located on the right forward stabilizer behind the driver's cab on the Dortech loader at the air freight facility."

A copy of said letter was sent to Yoder.

Subsequently a hearing was held by C. J. Cox under the provisions of Article 11(b)(8) of the Collective Bargaining Agreement.[1] On October 16, 1972, Mr. Cox directed a letter to the plaintiff containing the following language in part:

"After reviewing the testimony presented at your discharge hearing, I have concluded that the evidence presented placed you in the area where the damage occurred at a time when there were no other personnel in the area. It is, therefore, my opinion that the charge against you has been substantiated and your services with TWA are terminated effective October 5, 1972."

Copies of that letter were sent to Yoder, the Union shop steward, and to certain personnel of TWA.

Plaintiff contends that Buxton's statement of October 5, 1972, is slanderous and that the letters of October 6 and October 16, 1972, are libelous. Defendant contends that the actions complained of were absolutely privileged and, alternatively, if only qualifiedly privileged, that no malice has been shown sufficient to establish an abuse of said privilege.

■ In this Circuit all inferences which can be drawn reasonably for the party opposing a motion for summary judgment must be drawn. Even where there is no dispute as to demonstrable historical facts, summary judgment cannot be granted if differing inferences can be drawn from those undisputed historical facts sufficient to create a material dispute of fact. Phoenix Savings and Loan, Inc. v. Aetna Casualty and Surety Co., 381 F.2d 245 (4th Cir. 1967).

This court is of the view that the motion for summary judgment should be granted and, without belaboring the point, I will briefly set forth the reasons.

## I

■ ■ Assuming that there is no overriding federal policy which would require the application of federal law to the issues here presented, the case would

1. Article 11(b)(8) of the Collective Bargaining Agreement provides in pertinent part:
   "DISCHARGE
   "No mechanic who has been in the service of the Company one hundred and eighty (180) days or more as a Mechanic, and no other employee who has been in the service of the Company ninety (90) days or more, shall be discharged without a fair hearing (No hearing will be conducted without the presence of duly authorized Union representation, i. e. committeemen designated by the Union.) before a designated representative of the Company, other than the one bringing the complaint against the employee. If an employee is suspended, pursuant to Article XI(c)(4), the Company will advise the employee and/or his duly authorized Union Representative in writing of the precise charge or charges preferred against him not later than one (1) work day from the time of the suspension.

   "A discharge hearing will be held not later than five (5) days after the employee and the Union are notified of the precise charges and a written decision will be issued within three (3) work days after the close of the hearing. Prior to the hearing, the employee and his duly authorized representative will be given a reasonable opportunity to secure the presence of necessary witnesses. If the decision is not satisfactory, then appeal may be made in accordance with the procedure prescribed in Step Three.
   "If the above mentioned provisions are not adhered to, the employee and his duly authorized Union Representatives shall be notified in writing advising him of his reinstatement in accordance with Article XI(b)(9) of this Agreement.
   "The notification of the decision of the discharge hearing is to be mailed and postmarked not later than three (3) work days after the close of the hearing."

then be required to be decided under Maryland law. In a diversity case, the District Court applies the conflicts rules of the forum state. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The Maryland rule of conflicts applicable here is *lex loci delicti*, the place of the tort is the law to be applied. Dersookian v. Helmick, 256 Md. 627, 261 A.2d 472 (1970).

■ Maryland has not explicitly, through its courts, adopted the doctrine of absolute privilege for quasi-judicial proceedings. Maryland has, in a number of circumstances, adopted the doctrine of qualified privilege. Under Maryland law a communication arising out of an employer-employee relationship enjoys a qualified privilege, which can be negated by the existence of malice on the part of the declarant of allegedly libelous or defamatory words. Under Maryland law it is the responsibility of the court to determine whether allegedly libelous words were written on a privileged occasion. Hanrahan v. Kelly, 269 Md. 21, 29, 305 A.2d 151 (1973); Peurifoy v. Congressional Motors, Inc., 254 Md. 501, 512, 255 A.2d 332 (1969); Fresh v. Cutter, 73 Md. 87, 93–94, 20 A. 774 (1890).

■ The qualified privilege exists in this type of case. Peurifoy v. Congressional Motors, Inc., *supra*; Stevenson v. Baltimore Baseball Club, Inc., 250 Md. 482, 243 A.2d 533 (1968); Henthorn v. Western Maryland Railroad Co., 226 Md. 499, 174 A.2d 175 (1961). Where a conditional privilege exists, the burden, under Maryland law, is on the plaintiff to show actual malice in order to escape the results of the qualified privilege. Hanrahan v. Kelly, *supra*; Stevenson v. Baltimore Baseball Club, Inc., *supra*.

In *Stevenson, supra,* and *Peurifoy, supra,* directed verdicts were upheld for the defendant. In *Henthorn, supra,* the court upheld a summary judgment for the defendant.

In Orrison v. Vance, 262 Md. 285, 277 A.2d 573 (1971), the Maryland Court of Appeals also upheld a directed verdict for the defendant. In that latter case the court said at 294:

> "Orrison has the burden of proving not only actual malice but also that the statements are false. . . . And he argues also that ordinarily actual malice is a jury question . . . , but we see nothing in this record which suggests the presence of actual malice sufficient to defeat Vance's privilege or even to justify the submission of the issue to a jury."

The Court of Appeals in Orrison v. Vance went on to say, quoting 1 Harper and James, The Law of Torts, § 5.27 (1956), with approval, that " 'Actual malice' really does not exclusively mean ill-will. It is better described as an improper purpose, i. e., a purpose inconsistent with the social policy which it is the purpose of the law to secure by the technical device of privilege." 262 Md. at 295, 277 A.2d at 577; Judge McWilliams, speaking for the court, also said:

> "All that Orrison has come up with is the fact that Vance does not like him, pointing to other litigation . . ., and Vance's statement to that effect. (Footnote omitted). Clearly Orrison is not a hero to Vance and there is little doubt Orrison considers Vance a low fellow. But, in these circumstances, this is not evidence of ill-will."

262 Md. at 295, 277 A.2d at 578.

Although the opportunity to do so has existed, and plaintiff has not, by any request for admissions, through interrogatories nor through depositions nor affidavits, established any dispute of material fact relating to the circumstances under which the suspension of Macy occurred.

No factual dispute exists but that there was something wrong with an hydraulic fitting; nor is there a dispute of fact as to Burton and Martinek being requested to investigate; nor a dispute of fact that they did investigate and pointed the finger at Macy as a deliberate saboteur; nor is there a dispute

of fact that Cox received the investigative report and called his superiors in Philadelphia about the report; nor is there a dispute of fact that the decision to suspend Macy was reached in or immediately after that telephone call.

What happened thereafter, resulting in the specific statements which are the subject of the suit, were statements made under procedures established by Article 11(b)(8) of the Collective Bargaining Agreement. There is absolutely nothing in the record to demonstrate that the words spoken or written were excessive or abusive by either Buxton or Cox under the circumstances. Buxton confined the words spoken and written to a specific and informational description of the charge against Mr. Macy which was relevant to the occasion and which was required by the Collective Bargaining Agreement.

The initial charges, the October 5, 1972, words and the October 6, 1972 letter, were not made in reckless disregard of the truth as charges were placed against Macy, according to this record, only after full investigation, the filing with Cox of a written report, and corporate consultation. The final discharge letter of October 16, 1972, followed an evidentiary and adversary hearing, which was required by the Collective Bargaining Agreement.

█ Before informing Mr. Macy of the charges, Buxton asked other employees, who were present in his office when he received the instruction from Cox to suspend Macy to leave. Only Mr. Barton, a representative of the union, was requested to remain behind with Mr. Macy when the oral notice of suspension was given to Mr. Macy. Buxton's affidavit states that he believed that Barton had a right to be present, and the language of Article 11(c)(4) [2] would support that opinion. The written letters, as well as oral statements

were directed only to proper parties with a legitimate interest in the subject matter. Furthermore, there in nothing in this record to establish that Buxton used the occasion to make unrelated defamatory comments toward Mr. Macy outside of the matter which had been brought to his attention and that of Mr. Cox by the investigation of Burton and Martinek.

█ Plaintiff asserts that Cox refused to remove himself as a hearing officer after the union requested that he do so, and that Mr. Cox, on his deposition, did not recall that he had failed to disqualify himself. The court, reading Article 11(b)(8), which states in part that the hearing is to be held before "a designated representative of the company, other than the one bringing the complaint against the employee" does not necessarily reach the conclusion that would require, under the circumstances of this case, the disqualification of Mr. Cox. It was not Mr. Cox, under the record here, who pointed the finger at Mr. Macy; it was Mr. Burton and Mr. Martinek who made the complaint against Mr. Macy. Mr. Cox did not make the complaint, but acted upon the complaint, which is a different function. So, that circumstance does not, in this court's view, create an inference of malice on the part of Mr. Cox.

█ The plaintiff further directs the court's attention to the fact that Cox was missing some keys earlier in the day; that he had Buxton bring six employees to Buxton's office to empty their pockets, and that they did so only under threat of suspension for insubordination; and that Buxton, upon advising Cox that Barton and Macy had finally emptied their pockets, disclosing no keys, was directed by Cox to suspend Macy for sabotage.

If, through other admissible evidence, facts had been established or alleged

---

2. Article 11(c)(4) of the Collective Bargaining Agreement provides in pertinent part: "In meetings for the purpose of investigation of any matter which may eventuate in the application of discipline or dismissal, an employee will be entitled to Union representation, if he so desires."

tending to create a dispute of material fact as to the time that the decision to dismiss Macy had been made, perhaps the key incident could permit a proper inference of malice. However, under the facts in this case, undisputed according to the record, the decision to fire Macy or to suspend Macy was made before the "key" incident, and the only reasonable and proper inference to make as to the timing of the suspension of Macy by Buxton was that it was approaching the time when he would have been suspended in any event, and that there was no reason to go through other procedures to have someone other than Buxton issue the oral suspension notice since Macy was already in the presence of Buxton at or near the end of his shift.

■ In short, while the existence of malice is a jury question, the Maryland Court of Appeals in numerous decisions has demonstrated that the court may determine whether or not there is sufficient evidence to permit a finding thereof by inference or otherwise. In this case the court is of the view that there is no fact or inference tending to establish the existence of malice on the part of the employees of TWA. They followed the procedures which were mandated by the Collective Bargaining Agreement and did not abuse the qualified privilege granted to their actions by the law of Maryland.

## II

■ Even if, under Maryland law, a qualified privilege did not exist, this court is of the view that the federal policies behind the Railway Labor Act,[3] which required the Collective Bargaining Agreement in the form in which it was adopted, creating the discharge and suspension procedure which was the occasion for the alleged defamatory language in this case, would require the grant of summary judgment.

The United States Supreme Court, in Andrews v. Louisville and Nashville Railroad Co., 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972), expressed its view that the grievance and arbitration procedures set forth in the Railway Labor Act were paramount over and not subservient to state law. The court there held that rights subject to, and created by, the Railway Labor Act were to be governed and enforced by federal law in the federal courts. If a party to a Collective Bargaining Agreement, in acting to enforce rights through procedures mandated by the Collective Bargaining Agreement and the Railway Labor Act, can, by complying with the requirements of said agreement and statute, be held subject to an action in libel for the acts mandated by said statute and agreement, the federal policies expressed in the Railway Labor Act would be substantially jeopardized.

■ Notices of suspension and dismissal for cause, which are contemplated by the Collective Bargaining Agreement for adjustment and arbitration pursuant to the Railway Labor Act, must be allowed to be made clearly and precisely in accordance with the policies of the Railway Labor Act and must not be allowed to be subject to the temptation of ambiguity or imprecision by one fearful of a libel action under state law. An absolute privilege therefore exists under federal law as to statements and communications made in complinace with requirements of a collective bargaining agreement mandated by the Railway Labor Act. *See* General Motors v. Mendicki, 367 F.2d 66 (10th Cir. 1966); Joftes v. Kaufman, 324 F.Supp. 660 (D.D.C. 1971); Corbin v. Washington Fire and Marine Insurance Company, 278 F.Supp. 393 (D.S.C.1968), aff'd per curiam, 398 F.2d 543 (4th Cir. 1969).

In short then, the court, whether deciding the matter under the state law of libel or the federal law relating to the policies behind the Railway Labor Act,

3. 45 U.S.C. § 151 et seq.

finds that there is no dispute of material fact and that the motion for summary judgment must be and is hereby granted. An order will be granted to that effect.